# Exhibit A

AO 106 (Rev. 04/10) Application for a Search Warrant

I CERTIFY THE FOREGOING TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL
CLERK OF COURT
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
BY:
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## for the
### Middle District of Florida

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| the premises known as 113 Marsh Island Circle, Saint Augustine, Florida 32095 | ) Case No. 3:19-mj- 1251- MCe ) ) ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
the premises known as 113 Marsh Island Circle, Saint Augustine, Florida 32095, more particularly described in Attachment A.

located in the _____ Middle _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:
see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1030 | Intentionally accessing a protected computer or computer network without authorization |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA Frank Norris, Federal Bureau of Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/11/19

*Judge's signature*

City and state: Jacksonville, Florida

Magistrate Judge Monte C. Richardson
*Printed name and title*

## AFFIDAVIT

I, Frank Norris, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent (SA) with the Federal Bureau of Investigation
(FBI) and have been so employed since March 2018.  I am an investigative or law
enforcement officer of the United States within the meaning of Rule 41(a)(2)(C) of
the Federal Rules of Criminal Procedure.  I am currently assigned to the Cyber Task
Force of the Jacksonville, Florida, Division of the FBI, where I conduct a variety of
investigations in the area of cyber-crimes.  Prior to this assignment, I was employed
as a Staff Operation Specialist (SOS) for the FBI for approximately 2 years.  As an
SOS I worked investigations pertaining to violent crimes, white collar crimes,
counter intelligence, domestic terrorism, cyber-crimes, cyber-crimes related to
national security.  Prior to working for the FBI, I received a Bachelor's degree in
Criminal Justice and in Political Science and also received a Master's Degree in
Information Systems.  I have received law enforcement training from the FBI
Academy at Quantico, Virginia.  A substantial portion of my duties are dedicated to
investigating cases involving financial and non-financial motivated computer
intrusions and Internet-enabled fraud.  Since becoming a Special Agent, I have
worked with experienced Special Agents who also investigate financial and non-
financial motivated computer intrusions and Internet-enabled fraud.  In the
performance of my duties, I have investigated and assisted in the investigation of
matters involving the unauthorized access of a computer network, fraud facilitated

through the use of the Internet, nation state computer intrusions, and computer intrusions for the purposes of financial gain. I have participated in the execution of numerous search warrants, including search warrants in cyber investigations.

2.     The statements contained in this affidavit are based on my personal knowledge as well as on information provided to me by other law enforcement officers. This affidavit is being submitted for the limited purpose of securing a search warrant, and I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe evidence of violations of federal law is present in the residence to be searched.

## REQUESTED WARRANT

3.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 113 Marsh Island Circle, Saint Augustine, Florida 32095 (hereinafter the "SUBJECT PREMISES"), as further described in Attachment A, for the things described in Attachment B.

## STATUTORY AUTHORITY

4.     As detailed herein, Samuel Arthur THOMPSON is the subject of an FBI investigation into the use of one or more computers to commit violations of Title 18, United States Code, Section 1030, which prohibits intentionally accessing a protected computer or computer network without authorization. A "protected computer" is a computer that is used in or affecting interstate or foreign commerce.

2

a.    Title 18, United States Code, Section 1030(a)(2)(C) provides that it is unlawful for an individual to "intentionally access a computer without authorization or exceed authorized access in order to obtain information from any protected computer."

b.    Title 18, United States Code, Section 1030(a)(5)(C) provides that it is unlawful for an individual to "intentionally access a protected computer without authorization, and as a result of such conduct, [cause] damage and loss." The term "damage" means any impairment to the integrity or availability of data, a program, a system, or information.

## PROBABLE CAUSE

5.    On December 10, 2018, I, Special Agent (SA) JulianCarl Slaughter, and Task Force Officer (TFO) Roger Prendergast interviewed Michael Webb, Vice President of Information Technology for the Jacksonville Jaguars (VICTIM COMPANY). Other employees of the VICTIM COMPANY present for the interview were Senior Manager of Technology and Events Jason Dean, Manager of Facilities Security Bobby Lyle, and Network Administrator Michael Potts. The VICTIM COMPANY is a National Football League (NFL) team that hosts a series of NFL games each football season at TIAA Bank Field, which is a stadium located at 1 TIAA Bank Field Drive, Jacksonville, Florida, within the Middle District of Florida.

3

6.      The interview was conducted as a result of FBI Jacksonville's receipt of a complaint from the VICTIM COMPANY that THOMPSON, a former contractor for the VICTIM COMPANY, had been accessing a secure computer network located within the VICTIM COMPANY's facility. As of February 23, 2018, THOMPSON was no longer employed by the VICTIM COMPANY and thus any access by THOMPSON to the VICTIM COMPANY's secure computer network was unauthorized.

7.      Through my investigation, I have learned that from April 1, 2017, to February 23, 2018, THOMPSON was a contract employee with the VICTIM COMPANY. THOMPSON was the video production engineer and control room equipment consultant for the VICTIM COMPANY's video board system located at the company's facility. The video boards controlled by the video monitor network, commonly referred to as a "Jumbotron," are designed to ingest video data from a separate network that controls instant replay, slow motion, and video play back. According to Michael Webb, THOMPSON was the architect of the video board system and is one of a very few people who understand how the VICTIM COMPANY's video monitor network and video boards are designed to operate. According to Michael Webb, THOMPSON was a contract employee of the VICTIM COMPANY. Michael Webb explained that THOMPSON had not informed the

4

VICTIM COMPANY that he was a convicted sex offender when he was hired.[1]  The VICTIM COMPANY chose not to renew THOMPSON's contract after learning he had not disclosed his past criminal record.

8.      While THOMPSON was a contract employee for the VICTIM COMPANY, THOMPSON had been authorized to use remote access software called TeamViewer to access the devices that control the video board network. TeamViewer is a proprietary computer software for remote control, desktop sharing, online meetings, web conferencing and file transfer between computers. TeamViewer can be used on devices using Microsoft Windows, macOS, Linux, Chrome OS, iOS, Android, Windows RT, Windows Phone 8 and BlackBerry operating systems.  Machines running TeamViewer can also be accessed by web browser.  By utilizing the TeamViewer software, THOMPSON had remote access to the video board system from any location with any device with internet service and a compatible operating system.  THOMPSON's TeamViewer account was not terminated when his contract ended with the VICTIM COMPANY.

---

[1] I note that, based on my review of a publicly available website maintained by the Florida Department of Law Enforcement ("FDLE"), THOMPSON is a registered sex offender residing at 113 Marsh Island Circle, Saint Augustine, Florida 32095-9644.  According to FDLE, THOMPSON was convicted on April 22, 1998, of Sexual Abuse 2nd and Sodomy 2nd in Mobile, Alabama.  I have ordered copies of court records associated with this conviction.

5

9.     On December 10, 2018, Michael Webb provided SA Slaughter with documents of the VICTIM COMPANY's investigation into the incident. From the documents provided I learned the following:

    a. December 3, 2018, the VICTIM COMPANY conducted an investigation into a series of video monitor network incidents that were from suspected improper accesses. During three events hosted by the VICTIM COMPANY, the video boards had experienced an outage from their standard operating design, as described below:

        i. On September 16, 2018, from 18:06:03 – 18:06:20 Eastern Time, during an event a video board experienced a loss in reference sync which manifested as a large horizontal green lines appearing across one whole video board.

        ii. On November 18, 2018, from 14:55:18 to 14:55:21 Eastern Time, during an event a video board experienced a loss in which resulted in green screens for multiple boards.

        iii. On December 2, 2018, from 14:38:37 to 14:38:42 Eastern Time, during an event a single video board experienced a change of what seemed to be the zoom of one of the base graphics displayed.

    b. At no point before or after the suspected problems being fixed were the operators or engineers for the VICTIM COMPANY able to replicate the issue causing the incidents. In all of the incidents, the outage

6

resulted in the inability for the video board system operators to display the desired content. This type of attack commonly is called a denial-of-service (DoS) attack. A DoS attack occurs when legitimate users are unable to access information systems, devices, or other network resources due to the actions of a malicious cyber threat actor.

c. An investigation conducted by the VICTIM COMPANY into the December 2, 2018, incident revealed that a command to change a specific parameter was the source of the outage. An unknown or "rogue" device had sent the command. The rogue device was an Abekas Mira workstation (named MIRA9120) that had been decommissioned from service and had been replaced with a new one. Abekas Mira is a server made by Ross Video, which is designed to produce instant video replays for live events.

d. Unbeknownst to the VICTIM COMPANY, the rogue device had been moved to a server rack adjacent to the server rack housing the active Abekas Mira servers in the facility's video board server room (referred to as the "Rack Room"). In its decommissioned state, MIRA9120 had no connections to any video system and only had a power cable and network cable connected to it. The rogue device had the appearance of an active and functioning part of the network because the new/replacement device and the rogue device display the label "SLOMO 03."

7

e. After the rogue device (MIRA9120) was identified, it was examined by the VICTIM COMPANY and was found to have the TeamViewer software installed and active. The TeamViewer software logs all connections by default but that feature had been disabled by the user who installed the program making any connections used by the TeamViewer software untraceable.

f. TeamViewer software previously had been removed from all of the devices in the network by the VICTIM COMPANY IT staff.

10.     On or about December 3, 2018, the VICTIM COMPANY IT staff disconnected the MIRA9120 from the video board network and re-enabled the TeamViewer connection logging in an attempt to discover any new connections made to MIRA9120 during the upcoming event on December 16, 2018. The VICTIM COMPANY IT staff re-enabled the TeamViewer logging in order to catch any unauthorized connections in the act of gaining access to the network.

11.     On January 3, 2019, Michael Webb provided SA Slaughter an image copy of the MIRA9120 hard drive and the results of the incident investigation from December 3, 2018. SA Slaughter, FBI Computer Scientist Tim McCrohan, and I conducted a complete review of the image and learned the following:

a. February 23, 2018 (THOMPSON's last day at work for the VICTIM COMPANY.)

8

      i. 9:09 am – According the Internet Browse History file, a user logged on to TeamViewer.us and downloaded TeamViewer onto the Abekas MIRA9120 Station.

      ii. 9:14 am – According to the TeamViewer Logfile, the username "Sam7" with TeamViewer User Identification Number 938826091 logged into TeamViewer and connected with username "MIRA9120" TeamViewer User Identification Number 625675632.

      iii. 9:24 am – According to the Internet Browse History file, a user logged on to rossvideo.com and downloaded the "Dashboard" software. Dashboard is a free software program that is designed for facility control and monitoring of devices in a network. The product is designed to work with Ross Video devices such as the Abekas Mira devices.

      iv. 9:43 am – According the Internet Browse History file, a user with ID 11649557 logged on to Dropbox.com to download the file "CarboniteLoadSave.grid" from the "Jag_SaveForLater" folder. On January 30, 2019, SA Slaughter served a subpoena to Dropbox.com for subscriber information for the account using ID 11649557. The results returned from Dropbox.com showed that Sam THOMPSON is the owner of account 11649557.

b. <u>December 16, 2018</u> (VICTIM COMPANY had a scheduled event):

9

     i. The first scheduled event the VICTIM COMPANY held with the MIRA9120 set to log connections made with the TeamViewer software.

     ii. 2:04 pm – According to the TeamViewer log file, user "DESKTOP-0ASEJS8 (1118559964)" logged into TeamViewer and connected with "MIRA9120 (625675632)". On February 1, 2019, I served a subpoena to TeamViewer for subscriber information for account 1118559964. According to the TeamViewer subpoena results received on February 26, 2019, account 118559964 logged into account 625675632 (the Abekas MIRA9120 Station) a total of 5 times, the last session using IP address *67.190.234.123* from a machine using a Windows 10 operating system.

12.    On January 9, 2019, I served a grand jury subpoena to TeamViewer and on January 24, 2019, TeamViewer returned the information requested. Based on my review of the return, I learned that the 938826091 ("Sam7") account had 14 sessions with the 625675632 ("MIRA9120") account. The last access to the 938826091 account started on November 18, 2018, by IP address *67.190.234.123* using an iPhone.

13.    On January 29, 2019, SA Slaughter served a grand jury subpoena to Dropbox.com and on February 1, 2019, Dropbox.com returned the information requested. Based on my review of the return, I learned that Dropbox.com account

10

11649557 was accessed using the IP address *67.190.234.123* on January 29, 2019, by the host "DESKTOP-0NP&MUJ" and January 30, 2019, by an iPhone using AT&T. The DropBox.com account 11649557 is registered to Sam THOMPSON who used the email address tvdirector911@gmail.com. This account was accessed to download the "CarboniteLoadSave.grid" file from the "Jag_SaveForLater" to the Abekas MIRA9120 Station during the unauthorized access on February 23, 2018.

14.     On March 4, 2019, I served a grand jury subpoena to Comcast Cable, and on March 11, 2019, Comcast Cable returned the information requested. Based on my review of the return, I learned that on December 16, 2018, the IP address *67.190.234.123* was assigned to Jean Louise Pucket at 113 Marsh Island Circle, St. Augustine, Florida, within the Middle District of Florida.

15.     Through my investigation I discovered that a rogue network device (MIRA9120), unknown to the IT staff of the VICTIM COMPANY, was used to conduct attacks on the Victim Company's video board network during scheduled events. I learned that the MIRA9120 device was accessed a by TeamViewer account that used the IP address *67.190.234.123* on THOMPSON's last day of work for the VICTIM COMPANY. I learned that on that same day files from THOMPSON's Dropbox account were accessed and downloaded via internet browser on the MIRA9120. That same MIRA9120 device was the source of several attacks carried out on the VICTIM COMPANY's network during scheduled events. On December 16, 2018, during a scheduled event the MIRA9120 device was accessed by a TeamViewer account that used the IP address *67.190.234.123*. I learned that the

11

*67.190.234.123* IP address is a Comcast Cable IP that is assigned to the residence of THOMPSON.

16.    On May 9, 2019, TFO Roger Prendergast observed a grey Mercedes SUV with the license plate ADAMS 2 parked next to a Black Chevrolet Tahoe at 113 Marsh Island Circle, St. Augustine, Florida. According to DAVID records pulled on May 9, 2019, Samuel THOMPSON and Jean Louise Pucket reside at 113 Marsh Island Circle, St. Augustine, Florida. Jean Louise Pucket has a Mercedes SUV with the license plate ADAMS 2 registered to her at 113 Marsh Island Circle, St. Augustine, Florida. The DAVID records also show that THOMPSON has a black Chevrolet SUV registered to the address 113 Marsh Island Circle, St. Augustine, Florida.

## TECHNICAL TERMS

17.    Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.    IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP

12

addresses.  Some computers have static—that is, long-term—IP
addresses, while other computers have dynamic—that is,
frequently changed—IP addresses.

b.   Internet: The Internet is a global network of computers and other
electronic devices that communicate with each other.  Due to the
structure of the Internet, connections between devices on the
Internet often cross state and international borders, even when
the devices communicating with each other are in the same state.

c.   Storage medium: A storage medium is any physical object upon
which computer data can be recorded.  Examples include hard
disks, RAM, floppy disks, flash memory, CD-ROMs, and other
magnetic or optical media.

d.   "Computer," as used herein, is defined pursuant to 18 U.S.C.
§1030(e)(1), as "an electronic, magnetic, optical, electrochemical,
or other high speed data processing device performing logical,
arithmetic or storage functions, and includes any data storage
facility or communications facility directly related to or operating
in conjunction with such device."

e.   "Computer hardware," as used herein, consists of all equipment
which can receive, capture, collect, analyze, create, display,
convert, store, conceal, or transmit electronic, magnetic, or
similar computer impulses or data. Computer hardware includes

13

any data processing devices (including, but not limited to, central
processing units, internal and peripheral storage devices such as
fixed disks, external hard drives, floppy disk drives and diskettes,
and other memory storage devices); peripheral input/output
devices (including, but not limited to, keyboards, printers, video
display monitors, and related communications devices such as
cables and connections), as well as any devices, mechanisms, or
parts that can be used to restrict access to computer hardware
(including, but not limited to, physical keys and locks).

f.      "Computer Software," as used herein, is digital information
        which can be interpreted by a computer and any of its related
        components to direct the way they work. Computer software is
        stored in electronic, magnetic, or other digital form. It commonly
        includes programs to run operating systems, applications, and
        utilities.

g.      The terms "records," "documents," and "materials," as used
        herein, include all information recorded in any form, visual or
        aural, and by any means, whether in handmade form (including,
        but not limited to, writings, drawings, paintings), photographic
        form (including, but not limited to, microfilm, microfiche, prints,
        slides, negatives, videotapes, motion pictures, photocopies),
        mechanical form (including, but not limited to, phonograph

14

records, printing, typing) or electrical, electronic or magnetic
form (including, but not limited to, tape recordings, cassettes,
compact discs, electronic or magnetic storage devices such as
floppy diskettes, hard disks, CD-ROMs, digital video disks
(DVDs), personal digital assistants (PDAs), multimedia cards
(MMCs), memory sticks, optical disks, printer buffers, smart
cards, memory calculators, electronic dialers, or electronic
notebooks, as well as digital data files and printouts or readouts
from any magnetic, electrical or electronic storage device).

h.   "Computer passwords and data security devices," as used herein,
consist of information or items designed to restrict access to or
hide computer software, documentation, or data. Data security
devices may consist of hardware, software, or other
programming code. A password (a string of alpha numeric
characters) usually operates a sort of digital key to "unlock"
particular data security devices. Data security hardware may
include encryption devices, chips, and circuit boards. Digitally
coded data security software may include programming code that
creates "test" keys or "hot" keys, which perform certain pre-set
security functions when touched. Data security software or code
may also encrypt, compress, or hide protected data to make it

15

inaccessible or unusable, as well as reverse the progress to restore it.

i.  Wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Many wireless telephones are minicomputers or "smart phones" with immense storage capacity.

16

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

18.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media (including, for example, a smartphone or tablet computer). Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

19.    *Probable cause.* I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe that records of evidentiary value will be stored on that computer or storage medium, for at least the following reasons:

        a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data

17

remains on the storage medium until it is overwritten by new data.

b.　Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.　Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.　Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

18

20.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

      a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

19

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media

20

that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or

21

00130

consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a

22

storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer to obtain unauthorized access to a victim computer over the Internet, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

21.   *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.

23

Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

      a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be

24

present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

22.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

23.     Because several people share the SUBJECT PREMISES as a residence, it is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described

25

in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

24.    I submit that this affidavit supports probable cause for a warrant to search the SUBJECT PREMISES described in Attachment A and seize the items described in Attachment B.

25.    Based on the foregoing, I have probable cause to believe Samuel Arthur THOMPSON has used and is using one or more computers and/or electronic storage media located in the residence located at the SUBJECT PREMISES, more fully described in Attachment A to this affidavit, to, among other things, conduct unauthorized access of computer networks belonging to the VICTIM COMPANY. Based on my training and experience, and after consulting with other FBI Special Agents that investigate similar computer intrusions, it is common practice that individuals who conduct such activity maintain physical control of instrumentalities used in the crime and/or in furtherance of the crime. Therefore, I have probable cause to believe that one or more individuals, using the residence described above, has violated Title 18, United States Code, Section 1030. Additionally, I have

26

probable cause to believe that fruits, evidence, and instrumentalities of violation of

Title 18, United States Code, Section 1030, as more fully described in Attachment B,

will be located at the SUBJECT PREMISES.

Respectfully submitted,

Frank Norris
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
On July ___ , 2019

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

27

## ATTACHMENT A

*Location to be searched*

The location to be searched is the premises known as 113 Marsh Island Circle, Saint Augustine, Florida 32095. The location to be searched is a single story neutral-colored stucco home with light-colored trim. Photos of the location to be searched are below:





## ATTACHMENT B

*Property to be searched and seized*

1.      Computers and electronic storage media.

2.      Any and all notes, documents, records, or correspondence, in any format and medium pertaining to the Jacksonville Jaguars.

3.      Routers, modems, and network equipment used to connect computers to the Internet.

4.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b.      Any and all computer software, including applications and programs that may be used for remote access to a computer.

   c.      evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of

2

malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

d.  evidence of the lack of such malicious software;

e.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

f.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

g.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

h.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

i.  evidence of the times the COMPUTER was used;

j.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

k.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

3

      l.     records of or information about Internet Protocol addresses used by the COMPUTER;

      m.    records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

      n.     contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

4

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

5